**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ANGIL MICHILLE STRICKLAND,**

      **Plaintiff,**

**v.**                                **Case No.: 2:15-cv-13771**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 9, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that is requests remand of the

Commissioner's decision; that the Commissioner's motion for judgment on the pleadings be **DENIED**; that the decision of the Commissioner be **REVERSED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   Procedural History

On October 1, 2012, Plaintiff Angil Michille Strickland ("Claimant"), filed an application for DIB, alleging a disability onset date of July 1, 2012, due to "fibromyalgia, migraines, GERD [gastroesophageal reflux disease], anxiety, back pain, left and right knee injury, back swelling, extreme back pain from bulging disc [and] knee pain. (Tr. at 234, 301).[1] The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 122, 134). Claimant filed a request for an administrative hearing, (Tr. at 141), which was originally held on March 19, 2014, before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 81-85). At this hearing, the ALJ ordered Claimant to undergo a mental status consultative examination. (*Id.* at 84-85). The hearing was adjourned and was concluded on July 16, 2014. (Tr. at 54-80). By written decision dated August 22, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 36-47). The ALJ's decision became the final decision of the Commissioner on August 13, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7,

---

[1] The ALJ noted in her decision that Claimant had previously filed for a period of disability and disability insurance benefits on October 3, 2011. (Tr. at 36). The claim was initially denied March 30, 2012. (*Id.*). Claimant also filed an application for SSI on October 3, 2011, which was technically denied due to excess income. (*Id.*).

8). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 9), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a Reply. (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 41 years old at the time that she filed the instant application for benefits, and 43 years old on the date of the ALJ's decision. (Tr. at 36, 234). She has a high school education and communicates in English. (Tr. at 300, 302). Claimant has previously worked as a certified nursing assistant, health unit coordinator, LPN, and patient care CNA. (Tr. at 303).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to

Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional

4

limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 38, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2012. (Tr. at 38, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the severe impairments of "fibromyalgia, degenerative disc disease of the spine, anxiety, depression and posttraumatic stress disorder." (Tr. at 38-40. Finding No. 3). The ALJ considered Claimant's additional potential impairments of Meniere's disease, gastroesophageal reflux disease ("GERD"), irritable bowel syndrome, migraine headaches, and sleep apnea. (Tr. at 38-40). However, the ALJ found these impairments to be non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 40-41, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with lifting of 20 pounds occasionally and 10 pounds frequently, sitting of six hours in an eight-hour workday, and standing/walking of six hours in an eight-hour workday. She can occasionally climb ramps and stairs; but should never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can have only occasional exposure to extreme cold, wetness, humidity, vibrations, and hazards. She can have no exposure to loud noise. She can understand, remember, and carry out simple tasks. She can respond appropriately to occasional interaction with co-workers and supervisors but should have no interaction with the general public. She can respond appropriately to occasional simple changes in work routine.

 (Tr. at 42-46, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform her past relevant work. (Tr. at 45-46, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 46-47, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1970 and was defined as a younger individual aged 18-49; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 46, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 46-47, Finding No. 10). At the light exertional level, Claimant could perform unskilled work as a hand packager, folder, or price marker. (*Id*). Therefore, the ALJ found

6

that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 47, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ failed to include in the RFC finding and the controlling hypothetical question posed to the vocational expert limitations related to Claimant's moderate difficulty in maintaining concentration, persistence, or pace. (ECF No. 9 at 9). At step three of the sequential analysis, the ALJ found that Claimant's mental impairments resulted in moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. (*Id.*). Yet, the ALJ's RFC finding and controlling hypothetical question only limited Claimant to work that required her to understand, remember, and carry out simple tasks and respond appropriately to simple changes in work routine. (*Id.*). Claimant contends that the foregoing limitations do not adequately account for the ALJ's finding that she has moderate difficulty in maintaining concentration, persistence, or pace. (*Id.*). Claimant asserts that jobs which involve simple tasks and minor changes in work routine also require an employee to focus and stay on task. (*Id.*). In support of her position, Claimant cites the decision of the United States Court of Appeals for the Fourth Circuit ('Fourth Circuit") in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and related decisions of this court. (ECF No. 9 at 10).

In her second challenge, Claimant argues that the ALJ performed an inadequate step three analysis. The ALJ found that Claimant's impairments, separately and in combination, did not meet or equal Listings 1.04 or 14.09. According to Claimant, the ALJ failed to discuss her reasoning for these conclusions, failed to cite to supporting evidence, and failed to compare Claimant's medical findings to the criteria contained in the listings.

(*Id.* at 12). As an example, Claimant points to the ALJ's statement that Claimant had no evidence of nerve root compression, spinal arachnoiditis, or lumbar stenosis. Claimant notes that the statement was not accompanied by any further discussion or factual support. (*Id.* at 13). Similarly, Claimant complains about the ALJ's treatment of her fibromyalgia, indicating that the ALJ only considered Listing 14.09, even though Claimant's fibromyalgia, combined with her mental impairments, likely met other Listings, such as 12.04 or 12.05. (*Id.*). Claimant cites *Radford v. Colvin*, 734 F. 3d 288 (4th Cir. 2013) and *Fox v. Colvin*, 632 F. App'x 750 (4th Cir. 2015) in support of her argument that the ALJ's step three analyses were insufficient.

In response to Claimant's brief, the Commissioner contends that the *Mascio* decision did not create a bright-line rule prohibiting an ALJ from accounting for moderate limitations in concentration, persistence, or pace by restricting a claimant to simple tasks. (ECF No. 12 at 8-9). The Commissioner cites to cases from the Eleventh Circuit, which hold that when the medical evidence demonstrates that a claimant can carry out simple tasks, a RFC and hypothetical question limiting the claimant to simple tasks can sufficiently account for moderate limitations in maintaining concentration, persistence, or pace. (*Id.* at 9-11). The Commissioner argues that, in this case, the limitation to simple tasks was adequate in light of the findings of consultative examiner, Angela Null. (*Id.* at 12).

With respect to Claimant's second challenge, the Commissioner argues that the ALJ's step three analysis is distinguishable from the step three analyses in *Radford* and *Fox.* (*Id.* at 14). The Commissioner emphasizes that the ALJ specifically reviewed the record for evidence of nerve root compression, spinal arachnoiditis, and lumbar spine stenosis, as required by Listing 1.04, and found no evidence of those conditions. (*Id.*). In

addition, the Commissioner maintains that although the ALJ did not elaborate as to why Claimant's fibromyalgia did not meet the severity required in Listing 14.09, the ALJ explained in the assessment of Claimant's mental impairments why Claimant did not establish marked limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (*Id.* at 15). The Commissioner contends that the same functional categories (activities of daily living; maintaining social functioning; and concentration, persistence, or pace) are used in the severity criteria of Listing 14.09. (*Id.*). Therefore, the ALJ did perform the necessary assessment to determine whether Claimant's fibromyalgia met Listing 14.09. (*Id.*). Moreover, the Commissioner points out that Claimant did not cite to any medical evidence that contradicts the ALJ's step three findings. (*Id.*).

In reply, Claimant rejects the Commissioner's suggestion that the ALJ's decision is consistent with the holding in *Mascio*. (ECF No.   13 at 1-2). Claimant reiterates that although the ALJ explicitly gave great weight to Ms. Null's findings in limiting Claimant to simple tasks, the ALJ never articulated a factual basis for her conclusion that Claimant was moderately limited in maintaining concentration, persistence, or pace. (*Id.* at 2). Moreover, despite having made that finding, the ALJ failed to explain why Claimant's moderate limitations did not necessitate additional restrictions in the RFC. (*Id.*). Finally, Claimant argues that, contrary to the Commissioner's assertion, the ALJ's step three analysis was conclusive and uninformative, thereby precluding meaningful review. (*Id.*).

## V.   **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The relevant medical information is summarized as follows.

### A. Treatment Records

On May 3, 2010, Claimant suffered a left knee injury from a fall during her employment at an assisted living facility. (Tr. at 390). Thereafter, she experienced only minimal improvement and noticed some instances of her knee popping and giving way. (Tr. at 390). Claimant was ultimately diagnosed with a contusion, but no fracture. (Tr. at 391). She also had no evidence of dislocation or joint effusion, and she displayed a full range of motion, albeit with some pain on full flexion. (Tr. at 472, 529). On May 24, 2010, Claimant continued to complain of popping and swelling in her left knee; however, an MRI of the knee was unremarkable. (Tr. at 527).

Claimant presented to St. Francis Hospital on March 27, 2011 with complaints of back pain resulting from "lifting and tugging" during orientation for a new job. (Tr. at 748-767). Claimant said she was lifting a resident without using a back brace when her back pain began. (Tr. at 758). Claimant reported the pain was constant, severe, and intensified with movement. (*Id.*). The pain was located in her low back and radiated to her shoulders and legs. (*Id.*). Claimant also reported weakness of her legs, numbness of her hands, and headache. (Tr. at 752). Claimant advised the examining physician that she had suffered a prior back injury in 2003. (Tr. at 749). Claimant's medical history also included hypertension, GERD, migraines, anxiety, and depression. (*Id.*). Claimant smoked one half pack of cigarettes per day. (Tr. at 749). She appeared well, although anxious, and her physical examination was normal. (*Id.*). Claimant received a differential diagnosis of herniated disc, strain or sprain. (Tr. at 750). An x-ray was taken of her lumbar spine, which revealed no acute fracture or dislocation, mild hypertrophic spurring, mild narrowing of all of the lumbar disc spaces with the exception of L3-4, and mild thoracolumbar scoliosis convex on the right side. (Tr. at 767). The radiologist interpreted

the x-ray as showing mild degenerative arthritis, but no acute bony pathology. (*Id.*). Claimant was provided an excuse to remain off of work for one to two days with the added instruction to check with her family physician prior to returning to work. (Tr. at 765). She was prescribed Decadron, Robaxin, and Ultram and was released home in stable condition with a diagnosis of lumbar sprain. (Tr. at 765).

On January 25, 2012, Claimant presented to John Rice, Certified Physician's Assistant ("PA-C") at Cabin Creek Health Systems, with a complaint of low back pain on the left side with "popping," which was ongoing for the past three weeks. (Tr. at 601). Claimant's current health issues included Vitamin D deficiency, hyperlipidemia, obstructive sleep apnea, depression, nicotine dependence, migraines, and GERD. (*Id.*). As to her medical history, Claimant reported having a sleep study in May 2011 that was read as negative for sleep apnea. (*Id.*). She also mentioned a visit to Charleston Area Medical Center on August 7, 2011 for nausea and tightness of the chest, which resulted in an abdominal ultrasound showing a "sluggish" gallbladder. (*Id.*). Claimant underwent a cholecystectomy in November 2011. (*Id.*). In addition, Claimant stated that she had an MRI of her left knee in November 2010, which was largely unremarkable. (*Id.*). Nonetheless, she received treatment for her knee problem, including physical therapy. (*Id.*). Once she was released from care, Claimant attempted to return to work. (*Id.*). However, after being at work for four hours, she had knee pain and the sensation that her knees were going to "buckle." (Tr. at 601-02). Claimant advised PA-C Rice that she had recently applied for disability benefits due to her persistent knee issues. (*Id.*).

PA-C Rice performed a physical examination of Claimant, documenting that she was alert, oriented, and in no acute distress. Her examination was normal, except for a finding of tenderness with spasm at L4-S1 on the right side. (*Id.*). However, Claimant had

11

no deformity of her back, and she demonstrated an adequate range of motion. (*Id.*). Her straight leg-raising test was negative. (*Id.*). Claimant was assessed with musculoskeletal lumbago, fatty liver, depression with anxiety, left knee pain status post trauma, colon polyps, migraines, hyperlipidemia, myalgia (suspect fibromyalgia), GERD, nicotine dependence, and Vitamin D deficiency. (*Id.*). An x-ray of her lumbar spine was ordered, and Claimant was told to apply warm moist heat to her back. (*Id.*). Claimant was also instructed to lose weight, stop smoking, use aspirin cream rub, and take over-the-counter nonsteroidal anti-inflammatory medication. (Tr. at 602-03).

Two days later, on January 27, 2012, Claimant presented to the CAMC Imaging Center for an x-ray of the lumbar spine. (Tr. at 479). The x-ray was compared to a prior study performed in 2007. (*Id.*). There appeared to be normal alignment of the spine without fracture, dislocation, or subluxation. (*Id.*). The prevertebral soft tissues were unremarkable; however, there were minimal spondylotic changes in the inferior lumbar spine. (*Id.*).

Claimant returned to PA-C Rice on February 13, 2012 with continued complaints of back pain. (Tr. at 598). Her physical examination was normal, other than flexion of the spine caused pain. (Tr. at 599).

On February 20, 2012, Claimant underwent an MRI of the lumbar spine at CAMC Women and Children's Hospital. (Tr. at 522). The MRI showed normal alignment with no fracture, dislocation, or subluxation. Diffuse disc bulges were seen at the L4-L5 and L5-S1 disc space levels. (*Id.*). There was mild narrowing of the central canal at L4-L5 with no evidence of neural foraminal stenosis. (*Id.*). The disc space height loss was noted to be mild at L4-L5 and L5-S1, and there was normal signal within the cord. (*Id.*). Based upon the MRI results, PA-C Rice ordered physical therapy for Claimant. She presented to the

CAMC Physical Therapy & Sports Medicine Center on March 12, 2012 for a low back evaluation. (Tr. at 544). Her gait was assessed as normal, and her posture was poor to fair. (*Id.*). Claimant's rehabilitation potential was described as "guarded." (*Id.*). Physical therapy was recommended on a schedule of two times per week for four weeks. (Tr. at 546).

On March 13, 2012, Claimant underwent another x-ray of the lumbar spine at Imaging Pro Solutions. (Tr. at 485). The x-ray revealed slight scoliotic changes and early degenerative changes. (*Id.*).

Claimant returned to the CAMC Physical Therapy and Sports Medicine Center three additional times in March 2012: March 22, March 26, and March 28. (Tr. at 540-43). On March 28, 2012, Claimant was assessed with chronic low back pain with symptom magnification, over reaction to light palpitation, and reported high pain ratings. (*Id.*). The therapist felt physical therapy was inappropriate for Claimant and, therefore, discontinued it. (Tr. at 541).

Claimant returned to PA-C Rice on May 14, 2012 with complaints of daily headaches, back pain, and tailbone pain. (Tr. at 595). Her physical examination was normal. (Tr. at 597). Claimant was advised to continue her treatment plan for low back pain, and she was provided a referral for pain management. (*Id.*).

On September 26, 2012, Claimant told PA-C Rice that although she spoke with someone in pain management in June, she did not initiate treatment due to financial reasons. (Tr. at 592-94). On this visit, Claimant complained of shaking, blurred vision, dizziness, and sweating for the past three years, which had become progressively worse. (*Id.*). She continued to have daily headaches and back pain. (*Id.*). Claimant said she had several instances of falling down due to her back "giving out." (*Id.*). Claimant reported

that physical therapy had not provided her with any relief. (*Id.*). PA-C Rice documented the physical therapist's assessment regarding Claimant's symptom magnification. (*Id.*). PA-C Rice performed a physical examination on Claimant, which was normal, including negative Phalen's and Tinel's signs. (*Id.*).

On October 17, 2012, Claimant presented to Charles Jacques, M.D., at Cabin Creek Health Systems, for a back pain referral made by PA-C Rice. (Tr. at 590-91). Claimant reported constant low back pain with flare-ups, that was aggravated by standing for long periods, with occasional transient leg numbness. (*Id.*). Claimant reported knee pain which started in her right knee in the 1990's, but had become bilateral. (*Id.*). She also reported pain in her hands with stiffness and swollen joints, as well as fibromyalgia with painful trapezius muscles accompanied by poor sleep due to pain. (*Id.*). Claimant took Cymbalta for pain relief. Dr. Jacques performed a musculoskeletal examination of Claimant. Starting with Claimant's spine, Dr. Jacques noted that Claimant's straight leg-raising was seventy degrees on both the right and left, with accompanying pain in the low back. (*Id.*). While in the supine position, Claimant's paraspinous muscle was tender and was in spasm in the lumbar spine. (*Id.*). Claimant's posterior superior iliac spine was tender on both sides, with rigidity and pain in the muscles. (*Id.*). In her upper back, Claimant's trapezius muscle was painful, more so on the right, with spasm and localized painful muscle nodule. (*Id.*). Dr. Jacques observed that Claimant had difficulty getting on the examination table and turning, due to back pain. (*Id.*). He assessed her with significant muscle spasm in the low back most likely due to early calcified tendinis diffusely. (*Id.*). She also had evidence of a disc bulge with mild spinal stenosis. (*Id.*). Dr. Jacques felt physical therapy could provide excellent benefits if administered properly, although he advised Claimant that the initial treatment would likely cause pain. (*Id.*).

An examination of Claimant's knees showed that the right knee ligaments were intact, but she had crepitus and clicking consistent with degenerative meniscus. (*Id.*). Her patellar compression was negative. (*Id.*). Dr. Jacques felt that Claimant's right knee symptoms were indicative of a degenerative meniscus and osteoarthritis. (*Id.*). Claimant's left knee showed similar, but less severe findings. (*Id.*).

Claimant's hands were also examined and displayed minimal joint swelling with intact strength and negative Tinel's and Phalen's signs. (*Id.*). Claimant did complain of ulnar nerve pain with palpation and shooting pain to the little finger. (*Id.*). Her hand pain showed some features of rheumatoid arthritis. (*Id.*). Dr. Jacques considered fibromyalgia as a diagnosis, but was not convinced that Claimant had that condition. (*Id.*). He recommended that Claimant use heat, physical therapy, and exercise to treat her symptoms. (Tr. at 591).

On October 31, 2012, Claimant presented to the CAMC Imaging Center for x-rays of her lumbar spine, right knee, and hands. (Tr. at 515-18). The radiologist found no acute osseous findings of the lumbar spine. (Tr. at 515). Claimant's knee x-ray revealed a normal knee, with no evidence of acute fracture, subluxation, or joint effusion, and joint spaces consistent with Claimant's age. (Tr. at 516). X-rays of Claimant's hands were likewise within normal limits, with no fractures or dislocation, preserved joint spaces, and no soft tissue abnormalities. (Tr. at 516-18).

Claimant attended seven sessions of physical therapy at the CAMC Physical Therapy & Sports Medicine Center in November 2012. (Tr. at 536-39). On November 8, Claimant tolerated the exercises well and had decreased pain after modalities. (Tr. at 539). On November 12, Claimant reported her left side felt somewhat better, although she continued to feel "twinges" on the right. (*Id.*). She also had increased spasms on the right

15

side after sitting up. (*Id.*). On November 15, Claimant rated her pain level as four to five on a ten-point pain scale. (Tr. at 538). She complained of muscle fatigue, but did not report increased pain. (*Id.*). On November 19, Claimant reported the "same pain" in her back and knees. (*Id.*). On November 21 and 27, Claimant reported her pain remained the same. (Tr. at 537). On November 29, Claimant tolerated her exercises, but stated that she hurt all over and her pain was still present at the same level of severity. (Tr. at 536).

On December 3, 2012, Claimant returned to PA-C Rice with numerous complaints, including Vitamin D deficiency, hyperlipidemia, obstructive sleep apnea, depression, nicotine dependence, migraines, and GERD. (Tr. at 586). PA-C Rice noted that Claimant's laboratory results for arthritis were unremarkable, and her physical examination was normal. (Tr. at 586, 589). He assessed Claimant with hypertension, questionable polyuria/polydipsia/diabetes insipidus, uncontrolled GERD, posttraumatic stress disorder ("PTSD"), depression with anxiety, myalgia (suspect fibromyalgia), lumbago, degenerative disc disease of the lumbar spine, bilateral hand pain, left knee pain, history of dizziness, migraines, fatty liver, colon polyps, hyperlipidemia, nicotine dependence, and Vitamin D deficiency. (Tr. at 588). Claimant was instructed to decrease Cymbalta, add Wellbutrin, and increase Topamax. (Tr. at 588-89). She was also given prescriptions for Lisinopril and Prilosec. (*Id.*). Claimant was to continue using moist heat, aspirin cream, and nonsteroidal anti-inflammatory medications for pain relief. (*Id.*). PA-C Rice also recommended psychological counseling. (Tr. at 588).

Claimant returned to the CAMC Physical Therapy & Sports Medicine Center three times in December 2012. (532-33, 536). On December 4, Claimant reported no new changes, but had a slight "puffiness" on the right side of her back. (Tr. at 536). She continued to have moderate pain, but did note a decrease in symptoms after completing

16

her modalities. (*Id.*). Claimant canceled her December 6 appointment due to illness. (Tr. at 531, 533). On December 11, Claimant reported no change in her symptoms. (Tr. at 533). She was not able to advance her exercise regimen and showed poor tolerance to the current exercises. (*Id.*). The therapist decided to schedule one more visit before determining if Claimant should continue with physical therapy. (*Id.*). On December 14, 2012, Claimant was discharged from physical therapy, because she was unable to advance in the exercises and demonstrated poor tolerance to therapy. (Tr. at 532).

On January 16, 2013, Claimant returned to Dr. Jacques, who documented that after only six physical therapy sessions, Claimant was discharged due to a lack of improvement. (Tr. at 584). Dr. Jacques performed an examination, finding Claimant to be alert and oriented. (Tr. at 585). Her physical findings were normal, except for maximal clicking in the temporomandibular joint and spasm of the pterygoid muscles. (*Id.*). Dr. Jacques assessed Claimant with back pain, headaches with a TMJ component, and GERD that appeared to be worsening. She was instructed to continue home exercises, take Tylenol and Flexeril for pain, and stop taking all nonsteroidal anti-inflammatories. (*Id.*). Dr. Jacques gave Claimant a dental referral for her TMJ. (*Id.*). He also felt that Claimant had depression, so he prescribed a low dose of Prozac. Dr. Jacques decreased Claimant's current prescription of Cymbalta and advised her to continue taking that medication for fibromyalgia. (*Id.*). Finally, Dr. Jacques offered Claimant an injection for her knee pain. (Tr. at 585).

Claimant continued to seek treatment with PA-C Rice on March 4, 2013, and also on April 8 and April 29, 2013. (Tr. at 571-581). On March 4, PA-C Rice discontinued Wellbutrin and Lisinopril. (Tr. at 573). He prescribed Metoprolol, Premarin, Flexeril, and Reglan. He again recommended counseling. (Tr. at 574). Claimant continued to complain

of back pain that was getting progressively worse, sciatica-like symptoms, pain and swelling in her hands that radiated up to her elbows, bilateral knee pain and "popping," intermittent stabbing pain in her tailbone, and incidents of her back "giving out," causing her to fall down. (Tr. at 572). On April 8, 2013, Claimant presented to PA-C Rice for an injection in her left knee. (Tr. at 578). PA-C Rice noted that Claimant's mood had become worse with increased anxiety, nightmares, mood swings, and hot flashes. (*Id.*). Claimant reported that she had restarted Premarin in March, which helped with these symptoms. (*Id.*). She also reported that Prozac had been prescribed for her by Dr. Jacques, but it "made her lips tingle." Claimant indicated that she did not want to receive counseling. (Tr. at 578). Claimant's physical examination was unremarkable. (*Id.*). PA-C Rice administered an injection of 40 mg of Kenalog in the left knee with no complications. (Tr. at 581).

Claimant presented to Dr. Jacques on May 13, 2013 with complaints of a cyst on her back, which had been painful for some time, had become infected, and then spontaneously drained on May 12.  (Tr. at 569). Claimant also complained of persistent pain in her low back and coccyx. (*Id.*). Dr. Jacques reviewed an MRI report, which showed degenerative disc disease with mild spinal stenosis, but no foraminal narrowing. Despite this negative finding, Claimant complained of nerve pain intermittently. (*Id.*). On examination, Claimant's mental status was normal, but her physical assessment revealed an infected cyst on Claimant's upper back. (Tr. at 570). Dr. Jacques treated the cyst by incision and drainage. He packed the wound and provided Claimant with instructions on wound care. With respect to her back complaints, Dr. Jacques ordered an x-ray of the coccyx. The x-ray showed no focal bone lesion or osseous loose body. (*Id.*). Claimant had normal alignment of the sacrococcygeal segments with unremarkable sacroiliac joints.

Claimant returned to Dr. Jacques on May 15, 2013 for follow-up of the cyst on her upper back. (Tr. at 567). At this visit, Claimant's medication regimen included Bactrim, buspirone, Cymbalta, Flexeril, Lisinopril, Lopid, Metoprolol, Prilosec, Reglan, Topamax, and Wellbutrin. (*Id.*). Her triglycerides were high. (*Id.*). Dr. Jacques discussed weight loss with Claimant. (*Id.*).

Claimant presented to Charleston Area Medical Center on May 29, 2013 for complaints related to GERD. (Tr. at 645-46). She appeared in no acute distress, and her psychological examination was unremarkable. (*Id.*). The attending physician, Dr. Sankari, diagnosed Claimant with worsening dyspepsia, early satiety, and heartburn that was not responding to the use of a proton pump inhibitory. (*Id.*). He decided to proceed with an upper endoscopy, which was performed on June 7, 2013. (Tr. at 641). The post-operative diagnosis was nonspecific gastritis and Grade I erosive esophagitis. (*Id.*).

On June 13, 2013, Claimant presented to Dr. Jacques for follow-up. (Tr. at 565-66). Claimant's physical examination was normal, other than point tenderness of the coccyx. (*Id.*). Dr. Jacques referred Claimant to Dr. Salada for back pain, discussed estrogen replacement, and counseled her on weight loss. (Tr. at 566). She returned on July 29 with continued complaints of back pain, knee pain, and migraine headaches. (Tr. at 670). Dr. Jacques reduced Claimant's Cymbalta on the theory that it might be contributing to her GERD, and also reduced the dosage of Topamax. (*Id.*). Claimant's blood pressure was well-controlled, so Metoprolol was discontinued. (*Id.*). Dr. Jacques indicated that he would consider injecting Claimant's left knee at the next visit. (Tr. at 671).

Claimant presented to Dr. Jacques on September 16, 2013. (Tr. at 681-84). Claimant complained of GERD, migraine headaches, back pain, sleep apnea,

hypertension, and right knee pain. (Tr. at 682). Upon examination, Claimant did not appear in any distress. (*Id.*). Her mental examination revealed good insight and judgment, and she exhibited a normal mood and affect. (*Id.*). Claimant was walking with a pronounced limp, however, and she had marked crepitus and a decreased range of motion of the right knee. (Tr. at 682-833). Claimant also exhibited obvious back pain and cyanotic extremities. (*Id.*). Dr. Jacques injected Claimant's right knee with Kenalog and lidocaine. She experienced pain relief from the injection, but continued to display a limited range of motion and muscle weakness. (*Id.*). Dr. Jacques assessed Claimant with obstructive sleep apnea syndrome; benign essential hypertension; migraine headache; hyperlipidemia; depressive disorder, not otherwise classified; Vitamin D deficiency; nicotine dependence; knee pain; and GERD. (*Id.*). He recommended that Claimant use a cane to prevent falls. (Tr. at 684).

Claimant returned to Dr. Jacques one month later on October 17, 2013. (Tr. at 677-80). She was having panic attacks due to financial stress; however, she did report that Prozac offered some relief. (Tr. at 678). Physically, Dr. Jacques observed that Claimant ambulated normally and appeared to be in no acute distress, although she had significant crepitus in the left knee. (Tr. at 679). Psychologically, Claimant was alert and showed good insight and judgment, but she was anxious. (*Id.*). Dr. Jacques's diagnoses remained essentially same, with the addition of gastroparesis syndrome and panic disorder. (Tr. at 680). Claimant was given a prescription for Prozac, along with a corticosteroid injection to her left knee. (*Id.*).

On January 11, 2014, Claimant underwent a CT scan of the abdomen at St. Francis Hospital, which showed fatty infiltration of the liver, status post cholecystectomy, and no evidence of hypronsphrosis, or periaortic adenopathy. (Tr. at 723). Claimant returned to

20

St. Francis on January 15, 2014 with complaints of abdominal pain related to drinking contaminated water. (Tr. at 701, 703). A review of systems, including musculoskeletal and psychiatric, was normal other than gastrointestinal complaints. (Tr. at 703). Claimant's physical examination was unremarkable, except for diffuse abdominal tenderness. (Tr. at 708). After laboratory testing was completed, Claimant was diagnosed with colitis. (Tr. at 711). She was told to see her family doctor and consult with Dr. Haffar, a gastroenterologist.

Claimant presented to Dr. Jacques for follow-up of her abdominal pain on January 20, 2014. (Tr. at 673-76). Claimant reported panic episodes and stress related to losing her home, filing for bankruptcy, and other issues. (Tr. at 674). Her examination was unremarkable, however. (*Id.*). Claimant returned ten days later on January 30. (Tr. at 665-68). She complained of mild numbness in the lateral aspect of her hands, which was temporal and resolved on its own. (Tr. at 666). The numbness occurred when her hands were placed in certain positions. (*Id.*). Claimant reported having switched psychotropic medication to Wellbutrin for anxiety and depression, although she also took buspirone and hydroxyzine as needed. (*Id.*). Claimant was taking Topamax for chronic migraine headaches, but had slowly decreased the dosage as her headaches improved. (*Id.*). Claimant also complained of experiencing "shooting" pain down her legs, accompanied by numbness, if she stood fifteen to twenty minutes. (*Id.*). Claimant's examination was essentially normal. (Tr. at 667). Her Tinel's sign and nerve compression testing were negative, and her hands displayed no obvious abnormalities. (*Id.*). Claimant was advised to continue taking her medications and was given a trial dose of Wellbutrin to treat her anxiety and depression. (*Id.*).

**B. Evaluations and Opinions**

On March 13, 2012, Kip Beard, M.D., examined Claimant for the West Virginia Disability Determination Service. (Tr. at 480-486). His impression was that Claimant suffered from chronic cervical, thoracic, and lumbosacral strain; chronic arthralgias, osteoarthritis; and fibromyalgia according to history. (Tr. at 484). Dr. Beard's examination revealed some motion abnormalities and discomfort without neurological compromise. (*Id.*). Dr. Beard noted patellofemoral crepitus, which was more prominent on the right; possible effusions that were slight; and mild motion abnormalities, but he observed that Claimant was not limping on the day of the examination. Dr. Beard did not see a need for ambulatory aids. (*Id.*).

On March 28, 2012, Narendra Parikshak, M.D., evaluated Claimant's Physical Residual Functional Capacity. (Tr. at 487-494). Dr. Parikshak found Claimant's allegations to be only partially supported by the record. (Tr. at 492). She noted that Claimant complained of limitations in the range of motion of her lumbar spine and right knee, but that the MRI of Claimant's right knee was negative. (*Id.*). Moreover, Claimant's gait, strength, and neurological findings were without significant abnormality. (*Id.*).

On November 14, 2012, Chester Frethiem, Psy.D., evaluated Claimant's mental functioning and determined that Claimant did not have any severe mental impairments. (Tr. at 94-96). As to functional limitations, Dr. Frethiem felt that Claimant had no restrictions of activities of daily living; no difficulties in maintaining social functioning; and no difficulties in maintaining concentration, persistence, or pace. (Tr. at 94-95). He noted that Claimant's medical records included diagnoses of anxiety and depression, but could find no evidence, either in the treatment records or in Claimant's responses in the Adult Function Report, to indicate that Claimant had an impairment of her capacity to

perform work-related activities related to her diagnoses. (Tr. at 95). Dr. Frethiem found Claimant to be only partially credible. (Tr. at 96).

On February 28, 2013, Sue Westfall, M.D., responded to a series of questions regarding Claimant. (Tr. at 583). Dr. Westfall stated that she treated Claimant for depression and fibromyalgia, and that her diagnoses were based on clinical examination and history. (*Id.*). She opined that Claimant did not have a mental condition that posed functional limitations or interfered with her ability to work. (*Id.*).

On March 15, 2013, Holly Cloonan, Ph.D., re-revaluated Claimant's mental impairments for the SSA. Dr. Cloonan noted that Claimant indicated worsening anxiety and depression; however, Claimant's treating medical source found that she had no functional limitations associated with depression. (Tr. at 110). Dr. Cloonan concluded that Claimant's depression was non-severe. (*Id.*). Unlike Dr. Frethiem, Dr. Cloonan determined that Claimant had mild restrictions in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. at 109). However, like Dr. Frethiem, Dr. Cloonan found Claimant to be only partially credible. (Tr. at 111).

On April 1, 2014, a licensed psychologist, Angela Null, M.S., evaluated Claimant for the West Virginia Disability Determination Service. (Tr. at 788-797). Ms. Null performed a clinical interview and mental status examination, and reviewed Claimant's records. (Tr. at 788). Ms. Null opined that Claimant's concentration was within normal limits based on her ability to repeat digits; that her persistence was good based upon her ability to remain on task during the evaluation; and that her pace was within normal limits. (Tr. at 791). Ms. Null determined Claimant's social functioning to be moderately deficient based on her interactions with the examiner and others, including Claimant's

23

eye contact, sense of humor, and mannerisms. (Tr. at 791). Based on a review of the records and on her examination, Ms. Null diagnosed Claimant with chronic posttraumatic stress disorder; recurrent, moderate major depressive disorder; and pain disorder associated with both psychological factors and a general medical condition. (*Id.*). Ms. Null opined that Claimant prognosis was "poor." (Tr. at 793).

Ms. Null also evaluated Claimant's ability to do work-related activities on a sustained basis. (Tr. at 795-797). She noted that Claimant had no restriction in her ability to understand, remember, and carry out simple instructions. (Tr. at 795). As to Claimant's restriction in making judgments on simple work-related decisions, Ms. Null checked the boxes for both "none" and "mild." (*Id.*). Ms. Null concluded that Claimant was mildly deficient in understanding, remembering, and carrying out complex instructions and moderately deficient in making judgments on complex work-related decisions. (*Id.*). Ms. Null determined that Claimant's cognitive functioning was in the average range; her insight, judgment, and short-term memory were mildly deficient; her concentration was within normal limits; and her immediate memory was intact. (*Id.*). Further, Ms. Null found Claimant to be mildly deficient in her ability to interact appropriately with supervisors and co-workers, and moderately deficient in her ability to interact appropriately with the public and respond appropriately to usual work situations and changes in the work setting. (Tr. at 796).

On July 7, 2014, Claimant's treating doctor, Dr. Jacques, completed a Medical Assessment of Ability To Do Work-Related Activities (Physical). (Tr. at 918-923). Dr. Jacques opined that Claimant could lift or carry 5-10 pounds, but should avoid all lifting. (Tr. at 918). She could never climb, stoop, crouch, kneel, or crawl, (Tr. at 919). She should avoid all heights, and was limited to standing or sitting for short periods. (Tr. at 919-920).

24

Claimant could occasionally reach, but could frequently handle, finger, and feel items. (Tr. at 920). Claimant would need to take frequent unscheduled breaks and would frequently experience pain or symptoms strong enough to interfere with the attention and concentration needed to perform even simple tasks. (Tr. at 921).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

### A. The ALJ's RFC Finding and Controlling Hypothetical Question

In her first challenge, Claimant asserts that the ALJ failed to adequately address

her moderate difficulties in maintaining concentration, persistence, or pace. (ECF No. 9 at 9). Claimant points to the ALJ's RFC finding and the hypothetical questions posed to the vocational expert, which limited Claimant to work that required her to understand, remember, and carry out only simple tasks and respond appropriately to only simple changes in work routine. (*Id.*). Claimant contends that even simple job duties and minor changes in routine require a worker to be focused and stay on task. Accordingly, by neglecting to include limitations in the RFC finding to account for Claimant's impaired ability to focus and stay on task, the ALJ committed reversible error. Claimant adds that the ALJ may have corrected that error by explaining why additional limitations were not necessary in Claimant's case, but the ALJ failed to provide any explanation for the particular restrictions included in the RFC finding. Consequently, the ALJ's conclusion that Claimant could perform the work identified by the vocational expert was not corroborated by substantial evidence. (*Id.* at 10-12). For support, Claimant primarily relies on the Fourth Circuit's recent decision in *Mascio v. Colvin, supra.* (*Id.* at 10).

Like the present matter, the ALJ in *Mascio* determined at step three of the sequential process that the claimant experienced moderate difficulties in maintaining concentration, persistence, or pace. To account for the limitations, the ALJ included a restriction to "unskilled work" in the RFC finding. However, the ALJ failed to include the "unskilled work" restriction when posing the controlling hypothetical question to the vocational expert. *Mascio*, 780 F.3d at 637-38. Nevertheless, when responding to the question, the vocational expert identified only unskilled work in the list of jobs that the hypothetical individual could perform.

Although the vocational expert's response included only unskilled work—which arguably cured the defect in the ALJ's question—the Fourth Circuit still found the

26

hypothetical to be insufficient to address the claimant's moderate mental limitations. Agreeing with other circuits that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,'" the Fourth Circuit explained that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."[2] *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Consequently, the ALJ should have included mental limitations in the RFC finding and corresponding hypothetical question that specifically addressed the claimant's deficits in concentration, persistence, or pace. In the alternative, the ALJ should have explained why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the RFC finding. *Id.* Because the ALJ failed to do either, the Fourth Circuit found that remand was appropriate.

The same issue was subsequently addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W.Va. Sept. 30, 2015). There, the ALJ found that the claimant experienced moderate deficits in concentration, persistence, or pace. *Id.* at *1. Attempting to take these limitations into account, the ALJ restricted the claimant to work involving simple tasks and instructions. However, the ALJ provided no rationale for how such work would adequately address the claimant's deficiencies. On review, the Court indicated that including a limitation in the RFC that allowed claimant to perform only simple tasks, without further analysis, was still inadequate under *Mascio*. *Id.* at *4. The Court explained the principle espoused in *Mascio*: "If the ALJ found [the

---

[2] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, § 12.00(C)(3).

claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* Because the ALJ did neither, the Court found that remand was appropriate.[3] *Id.* at *5.

In contrast, this Court found that *Mascio* did not require remand in *Evans v. Colvin*, No. 2:14-cv-29072, 2016 WL 1258491 (S.D.W.Va. Mar. 30, 2016). In *Evans*, the ALJ found that the claimant experienced moderate limitations in concentration, persistence, or pace at step three. *Evans*, 2016 WL 1258491, at *5. The ALJ's RFC finding limited the claimant to simple, routine tasks, and the Court found that this restriction accurately reflected the claimant's mental ability. *Id.* In describing the standard for reviewing an argument under *Mascio*, the Court observed that "[w]here the medical evidence shows that a claimant can carry out simple tasks, an ALJ's hypothetical to the vocational expert to that effect will sufficiently account for a claimant's moderate limitation in maintaining concentration, persistence, and pace." *Id.* (quoting *Hurst v. Comm'r of Soc. Sec.*, 522 F. App'x 522, 525 (11th Cir. 2013)). The Court determined that the claimant's mental health treatment records and the opinion of a state agency medical consultant supported the ALJ's finding that the claimant could perform simple, routine tasks, despite moderate limitations in concentration, persistence, or pace. *Id.* In the end, the Court concluded that "the ALJ explained why [the claimant's] moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation in

---

[3] The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4.

[the claimant's] residual functional capacity, beyond restricting [the claimant] to unskilled work." *Id.*

In the instant action, the ALJ found at step two that Claimant had several severe mental impairments, including anxiety, depression, and posttraumatic stress disorder. (Tr. at 38). At the next step, the ALJ used the special technique in determining whether the severity of the mental impairments met or equaled a listed impairment. Relying solely on Claimant's statements in an Adult Function Report, the ALJ determined that Claimant experienced moderate limitations in concentration, persistence, or pace; specifically, Claimant complained of difficulty with memory, completing tasks, concentration, understanding, and following instructions. (Tr. at 41). The ALJ then found that Claimant's mental impairments limited her RFC to work that required her to understand, remember, and carry out only simple tasks and respond appropriately to only simple changes in work routine. (Tr. at 42).

In explaining the RFC finding, the ALJ discussed the consultative examination performed by agency psychologist, Angela Null. The ALJ noted that Ms. Null found Claimant's recent memory to be mildly deficient, but Claimant's concentration and pace were within normal limits and her persistence was good. (Tr. at 44). The ALJ also indicated that Claimant was taking medication for her anxiety and depression and had no side effects from the medication. The ALJ did not explain how this evidence influenced her RFC determination.

Later in the discussion, the ALJ addressed the opinions of the medical sources. She conceded that two agency psychologists, Dr. Frethiem and Dr. Cloonan, opined that Claimant's mental impairments were non-severe; however, the ALJ, without any further explanation, gave little weight to these opinions. (Tr. at 45). The ALJ also discussed the

opinion of Dr. Sue Westfall, a treating physician, who felt that Claimant's mental impairments did not pose any functional limitations and did not interfere with Claimant's ability to work. (*Id.*). Once again, the ALJ rejected these opinions, stating only that "the evidence of record supports the claimant's depression is severe and results in moderate limitations in social functioning and maintaining concentration, persistence, or pace." (*Id.*). The ALJ did not specifically cite to the evidence, nor did she provide an analysis of how the moderate deficits in maintaining concentration, persistence, or pace translated into limitations on a function-by-function basis. Finally, the ALJ considered Dr. Null's opinions expressed in a Medical Source Statement of Ability To Do Work-Related Activities (Mental) form, expressly giving them "great weight" because they were "consistent with the [ALJ's] finding the claimant could understand, remember, and carry out simple tasks; could respond appropriately to occasional interaction with co-workers and supervisors, but should have no interaction with the general public; and could respond appropriately to occasional simple changes in work routine." (*Id*). The ALJ did not reference the evidence that had informed her RFC finding, and did not explain how she reconciled the contradictory medical source opinions with her decision.

At the administrative hearing, the ALJ asked the vocational expert a series of hypothetical questions. In each scenario, the vocational expert was asked to assume that the hypothetical individual could understand, remember, and carry out simple tasks and respond appropriately to occasional/simple changes in work routine. (Tr. at 74-76). Addressing the first three scenarios, the vocational expert opined that the individual could perform work available in significant numbers in the national economy. However, when the ALJ asked the vocational expert to also assume that the individual would be off task 15 to 20 percent of the time, the vocational expert replied that no work would be available

to the individual. (Tr. at 76). Despite asking this question, and a few other questions related to being off task or off work, the ALJ did not address the subject in her written decision. Consequently, the ALJ never clarified whether Claimant's limitations caused her to be off task, and if so, how often Claimant was off task. The ALJ specifically stated that she did not accept as credible any of the hypothetical scenarios offered by Claimant's attorney; yet, the ALJ never acknowledged the effect that being off task would have on Claimant's occupational base, nor did the ALJ explain why her hypothetical questions including that limitation were not supported by the evidence.

Having reviewed the written decision, the undersigned **FINDS** that the ALJ erred in her treatment of Claimant's mental impairments. First, the ALJ failed to include restrictions in the RFC finding that fully accounted for Claimant's moderate deficits in concentration, persistence, or pace. As the Fourth Circuit pointed out in *Mascio*, restricting a claimant to simple instructions alone does not typically account for a moderate limitation in concentration, persistence, or pace. *See Mascio*, 780 F.3d at 638 ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). The vocational expert corroborated the merit of that position when she testified that jobs were available to a hypothetical individual who was restricted to simple work and minor changes, but were not available if the individual were also off task 15 to 20 percent of the time. As Claimant noted, jobs that involve simple tasks and uncomplicated changes still require an employee to focus and stay on task. (ECF No. 9 at 9).

Second, the ALJ's RFC discussion was woefully inadequate. When an ALJ finds that a claimant suffers from a moderate limitation in maintaining concentration, persistence, or pace, the ALJ must explain how that limitation is addressed in the RFC

finding, or why the limitation does not require an additional restriction in the RFC finding. *Jackson*, 2015 WL 5786802, at 5; *see, also, McDonough v. Comm'r, Soc. Sec. Admin.*, No. SAG-15-1090, 2016 WL 2770875, at *3 (D. Md. May 13, 2016) (remanding Commissioner's decision where ALJ's step three discussion indicated mild or no limitations in concentration, persistence, or pace, but ALJ ultimately found moderate limitation and failed to explain how restricting claimant to unskilled and simple work accounted for claimant's difficulties in concentration, persistence, or pace); *Williamson v. Colvin*, No. 1:14CV884, 2016 WL 1735889, at *7-*8 (M.D.N.C. May 2, 2016) (recommending remand where ALJ found moderate limitation in concentration, persistence, or pace, despite medical opinion evidence indicating claimant was not limited in that functional area, and ALJ failed to explain how limiting claimant to simple, routine tasks with no "production pace work" addressed claimant's ability to stay on task). In the absence of an adequate explanation, the reviewing court is unable to determine if the RFC finding is supported by substantial evidence.

Here, the ALJ did not review Claimant's concentration, persistence, or pace in her RFC discussion. Twice, the ALJ pointed out that Claimant suffered from moderate difficulties in these functional areas and specifically rejected opinion evidence to the contrary. Yet, the ALJ never explained how she reached the conclusion that Claimant's deficits could be addressed by restricting her to simple work and routine changes. While it is true that the ALJ afforded great weight to Ms. Null's functional assessment, and Ms. Null found Claimant capable of performing simple work-related duties, Ms. Null's opinions do not provide a reasonable substitute for the ALJ's explanation. For one thing, the applicability of Ms. Null's functional assessment is questionable given that Ms. Null did not believe Claimant had any limitations in concentration, persistence, or pace. (*Id.*).

Accordingly, the functional deficits found by Ms. Null were premised on the conclusion that Claimant's concentration, persistence, and pace were all within normal range. The ALJ never reconciled Ms. Null's premise with the ALJ's own conflicting opinion regarding the severity of Claimant's limitations. Moreover, the ALJ never explained why Ms. Null's RFC assessment should be given great weight despite its faulty premise. Notably, the ALJ did not assign weight to Ms. Null's RFC assessment based upon its consistency with the other evidence. Rather, the ALJ stated that the assessment was entitled to "great weight" solely because it was consistent with the RFC assessment already reached by the ALJ. (*Id.*). Considering that the ALJ never cited evidentiary support for her RFC assessment, the undersigned cannot determine whether the assessment was supported by substantial evidence.

Lastly, the undersigned cannot conclude that the ALJ's error was harmless. The jobs used to support the ALJ's step five finding (hand packager, folder, and price marker) likely require some degree of sustained concentration, persistence, or pace. Consequently, a moderate limitation in concentration, persistence, or pace could affect Claimant's ability to perform these jobs. The extent to which Claimant would be off task, and the effect that being off task would have on her ability to perform the jobs are matters to be resolved by the ALJ. The written decision is devoid of any useful analysis of these issues. Therefore, the Court is unable to determine whether the RFC finding and, thus, the hypothetical questions incorporating the RFC finding accurately reflect Claimant's work-related limitations and abilities. *See Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005) ("The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities.").

Because the ALJ's RFC discussion lacks an adequate explanation concerning Claimant's mental limitations and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the ALJ's decision at step five is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded so that the ALJ may reconsider, or elaborate on her discussion of, Claimant's mental restrictions.

### B. The ALJ's Step Three Analysis

In her second challenge, Claimant contends that the ALJ failed to perform an adequate step three analysis when she found that Claimant did not have an impairment or combination of impairments that met or equaled Listings 1.04 or 14.09. According to Claimant, the ALJ failed to explain her conclusion with references to the evidence, and failed to compare Claimant's treatment records to the criteria contained in those listings. (*Id.* at 12). Claimant additionally argues that the ALJ provided no factual basis to support her bald statement that the record lacked evidence of nerve root compression, spinal arachnoiditis, or lumbar stenosis as required by Listing 1.04. (*Id.* at 13). Similarly, Claimant emphasizes that while the ALJ found Claimant's fibromyalgia was not of the severity to equal Listing 14.09, the ALJ never considered whether that condition, in combination with Claimant's mental impairments, met Listings 12.04 or 12.05. (*Id.*). Claimant cites *Radford v. Colvin*, 734 F. 3d 288 (4th Cir. 2013) and *Fox v. Colvin*, 632 F. App'x 750 (4th Cir. 2015) in support of her argument that the ALJ's step three analyses were insufficient.

At step three of the sequential evaluation process, the ALJ determines if the claimant has an impairment that meets or equals one of the listings in appendix 1 of 20 C.F.R. Part 404, Subpart P. 20 C.F.R. §§ §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii). As is

the case throughout the sequential evaluation process, the ALJ must set forth the reasons for her step three determination. *See, e.g.*, *Radford*, 734 F.3d at 295 ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox*, 632 F. App'x at 755 ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record.").

Generally, it is inadequate for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. While there are exceptions to this rule, an ALJ's discussion is particularly important when the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing. *Id.* As stated in *Radford*, an "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler,* 783 F.2d 1168, 1173 (4th Cir.1986) (reversing and remanding when ALJ "failed to compare [the claimant's] symptoms to the requirements of any of the four listed impairments, except in a very summary way").

On the other hand, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx.

326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing]." Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 Fed.Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." (*Id.*) (quoting *Smith*, 457 Fed. Appx. at 328).

Here, the ALJ stated at step three of the sequential process that she evaluated Claimant's degenerative disc disease of the lumbar spine under Listing 1.04 and that Claimant "does not have evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required by the Listing." (Tr. at 40). While the ALJ did not elaborate on this determination in the section of her opinion addressing step three of the sequential evaluation process, she subsequently discussed the evidence potentially implicating Listing 1.04.

Listing 1.04. provides the following:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the

> need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04. As with any Listing, Claimant must meet or equal all of the specified medical criteria in order to meet Listing 1.04. *See Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.")

The ALJ's discussion of Listing 1.04 was sparse at step three of her analysis; however, she later summarized evidence which is relevant to the Listing 1.04 inquiry. The ALJ reviewed Claimant's testimony regarding her low back impairment, noting Claimant's statements that she had chronic low back pain; that her back got "stuck" when she bent over; that she used bars in the bathroom to keep from falling; that she had used a cane since October 2013; that her back tightened and hurt after sitting for 15 minutes; that she had to change positions after standing for 15 minutes; that her ability to lift was restricted; that her activities of daily living were limited; and that she regularly took pain medication. (Tr. at 42). The ALJ also cited to portions of Claimant's treatment record, which documented that Claimant's paraspinous muscles were tender, and she had lumbar spasms in the supine position; her posterior superior iliac spine was tender; she had rigidity and pain in the muscles; and her upper back examination revealed painful trapezius muscle spasms on the right greater than the left, with a localized painful muscle nodule. (Tr. at 43-44). In addition, the ALJ cited a 2012 progress note in which Claimant

was seen for back pain and had difficulty getting on the examination table and turning due to back pain; at that visit, Claimant's straight leg-raising results were 70 degrees bilaterally with low back pain. (Tr. at 43).

Nonetheless, in the same review of the evidence, the ALJ identified x-rays of Claimant's lumbar spine that showed no definite acute bony pathology and revealed only mild degenerative arthritis, with normal bone density, minimal spondylotic changes, degenerative disc changes at L4-L5 with diffuse disc bulge, and a mild central canal stenosis. (Tr. at 43-44). The ALJ further noted "normal findings" from Dr. Beard's consultative examination of Claimant's dorsolumbar spine, which revealed pain on range of motion testing with tenderness and normal curvature, flexion to 70 degrees with normal range of motion otherwise, straight leg raise results of 90 degrees bilaterally and 70 degrees bilaterally in the supine position with back and tail bone pain, and Dr. Beard's observation that Claimant's gait was non-limping in appearance and he did not see the need for ambulatory aids. (Tr. at 43).

Taken as a whole, the above record does not unequivocally support the ALJ's finding that Claimant "does not have evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as required by the Listing." (Tr. at 40). In fact, while some of the cited evidence supports such a finding, other evidence weighs against it. In the face of conflicting evidence, the ALJ should have explained her rationale by comparing the evidence to the criteria in Listing 1.04. Without the ALJ's explanation as to how she weighed the evidence, reconciled discrepancies in Claimant's medical records, consultative examinations, and reported symptoms, and applied those findings to the severity criteria of Listing 1.04, it is impossible for the court to determine if her decision is supported by substantial evidence. The Commissioner's argument that any error by the

ALJ in her step three analysis was harmless is without merit. In order to determine whether substantial evidence supports the ALJ's decision, the court "would be required to parse through the record, identify an alternative rationale—which was not provided by the ALJ—for why [Claimant's] impairments do not meet or equal the criteria of Listing 1.04[ ], then supplant the ALJ's defective rationale with this valid alternative theory." *McDaniel*, 2016 WL 1271509, at *8. As this Court stated in *McDaniel*, the Fourth Circuit has expressly found that such fact-finding missions are inappropriate where the ALJ failed to conduct the proper analysis in the first instance. *Id.* (citing *Fox*, 2015 WL 9204287, at *4).

Therefore, the undersigned **FINDS** that the ALJ erred in failing to explain or support her decision that Claimant's degenerative disc disease of the lumbar spine did not meet or equal the criteria of Listing 1.04. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded for the additional reason that the ALJ must reconsider, or elaborate on her discussion of, Listing 1.04.

Claimant next argues that the ALJ erred in concluding that Claimant's fibromyalgia was not of the severity to equal Listing 14.09 without proper support and that the ALJ did not even discuss whether the condition, in combination with Claimant's mental impairments, met Listings 12.04 or 12.05. At step three, the ALJ stated:

> The claimant's fibromyalgia is not a listed impairment and therefore cannot meet a Listing (SSR 12-2p). The claimant's fibromyalgia is therefore evaluated under the Listings to determine if it equals the requirements of a Listing in combination with at least one other medically determinable impairment. The undersigned has evaluated this condition under Section 14.09 for inflammatory arthritis, and finds that claimant's condition is not of the severity required to equal this Listing.

(Tr. at 40). Listing 14.09 provides the following:

14.09 Inflammatory arthritis. As described in 14.00D6, with one of the following:

A. Persistent inflammation or persistent deformity of:
1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or
2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7). or
B. Inflammation or deformity in one or more major peripheral joints with:
1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
or
C. Ankylosing spondylitis or other spondyloarthropathies, with:
1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or
2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.
or
D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.09.

The ALJ determined at the second step of her analysis that Claimant's fibromyalgia was a severe impairment. (Tr. at 38). Yet, at step three, just like her analysis of Listing 1.04, the ALJ made a conclusory statement that Claimant's fibromyalgia did not meet the severity required of Listing 14.09, without any application of the evidence to the criteria in the Listing. (Tr. at 40). This lack of discussion renders the step three analysis of

Claimant's fibromyalgia incapable of meaningful review. (Tr. at 40). While later in her decision, the ALJ cites some evidence which relates to fibromyalgia, she does not explain how she applied the evidence to Listing 14.09, or even identify which portions of Listing 14.09 she considered. (*Id*). Moreover, the ALJ apparently did not consider Claimant's fibromyalgia under any other listed impairment, as required by Social Security Ruling 12-2p. *See* 2012 WL 3104869 (S.S.A. Jul. 25, 2012). In the absence of a meaningful discussion, the Court is precluded from conducting a meaningful review.

Therefore, the undersigned **FINDS** that the ALJ's step three analysis regarding Claimant's fibromyalgia is not supported by substantial evidence. Accordingly, on this additional basis, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded so that the ALJ may reconsider, or elaborate on, her step three analysis regarding Claimant's fibromyalgia.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 9), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston,

United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** September 8, 2016

Cheryl A. Eifert
United States Magistrate Judge

42